The next case, agenda number four, case number 124100, People v. Brown, Mr. Fisher, you may proceed. Good morning, Your Honors. Good morning. May it please the Court, Assistant Attorney General Carson Fisher, on behalf of the people. Your Honors, it is undisputed that under the Illinois FOID Card Act, an Illinois citizen who is eligible for a FOID card may keep a gun in her home for self-defense. It is also undisputed that if someone is a felon or mentally ill, then the state is allowed to restrict the exercise of that right. As the Seventh Circuit recognized, if the state is allowed to impose these substantive restrictions on gun possession, and Keller says that it is, then it has to be allowed to implement a licensing scheme to enforce those restrictions. Indeed, there is a long-standing history of states using licensing schemes to enforce constitutionally permissible substantive restrictions on gun ownership. The FOID Card Act itself is more than 50 years old. It dates back to before the Illinois Constitution recognized the individual right to gun ownership. If you go back more than 100 years, New York State, Washington State, required licenses before a citizen could possess a firearm. That's why this court and other Illinois courts have repeatedly upheld the FOID Card licensing requirement at the first stage of its Second Amendment analysis. The regulated conduct, the substantive restrictions on gun ownership in the FOID Card Act, and a requirement that one obtain a license prior to possessing a firearm, lies outside the scope of Second Amendment protection. But even if the court advances to the second step of its Second Amendment analysis, the FOID Card Act is constitutional because it is substantially related to an important government interest in public safety, keeping guns out of the hands of inherently risky groups of people, like felons, mentally ill, and domestic violence misdemeanors. There is substantial peer-reviewed empirical data suggesting that licensing schemes are highly effective at keeping guns out of the hands of criminals. And while it is true that there is also empirical data arguing the contrary, and amici briefs engage in a lengthy battle about the quality of that research, courts have made clear that even when heightened means and scrutiny applies, conflicting data does not tie the hands of the legislature to make policy determinations. It is the General Assembly and not this court that is best equipped to make those kinds of determinations in the face of conflicting data. Indeed, the District of Columbia Circuit Court upheld the District's arguably more onerous requirement that all gun owners present themselves in person to the police for fingerprinting and photographing, applying intermediate scrutiny, and holding that that requirement directly contributed to ensuring public safety, advancing public safety, by keeping some guns out of the hands of some criminals, and also by ensuring that police could identify lawful gun owners during future encounters. The same is true here. Requiring potential gun owners to submit a photograph and submit themselves to a background check will keep some guns out of the hands of some felons, of some people with significant mental illness, of some domestic violence misdemeanors, and also the photograph is used directly for the purpose of enabling the police to more easily identify lawful gun owners during future encounters. And so there is a significant relationship between the Void Card Act and the important government interest in public safety by keeping guns out of the hands of inherently risky people. So for either of these reasons, either the first step of the Second Amendment analysis because licensing schemes like the Void Card Act are long-standing, or at the second stage of analysis because there is a substantial relationship between the Void Card Act and these important government interests, this court should uphold the Void Card Act under the Second Amendment. The defendant also argues that beyond the traditional Second Amendment analysis, that the $10 fee in the Void Card Act is unconstitutional because it is a tax on the exercise of her Second Amendment rights. The court has been clear that just because a regulatory scheme has the incidental effect of making the exercise of a constitutional right more expensive, it doesn't render the scheme unconstitutional. The courts apply the First Amendment fee jurisprudence to determine whether a charge is constitutional under the Second Amendment or in the Second Amendment context. And so long as that fee is put to use to frame the costs of the regulatory scheme and ensuring public order in the regulated area, it is permissible. Here, there's no secret about where the $10 go. Under the statute, it goes to the Illinois State Police and the Fish and Wildlife Fund, and under the regulations governing those agencies, that money is then put to use administering the Void Card Act and providing firearm safety training for gun owners in Illinois. So it goes directly to the regulatory scheme and to ensuring public order in the area of safe gun ownership. Are all of your arguments directed to the federal Constitution or also to the Illinois Constitution? Well, they go to the Illinois Constitution as well, Your Honor, because at this point, the Illinois Constitution no longer affords greater protection than the federal Constitution. It is true that at the time of drafting of the Illinois Constitution, the language differed from the federal Constitution to ensure that it recognized an individual right to possess firearms, which at the time, the Supreme Court had not recognized within the confines of the Second Amendment. Since Heller, the Second Amendment has been held to also recognize an individual right to gun ownership. Indeed, the protections afforded by the court under the Second Amendment have far outstripped those afforded by this court under the Illinois Constitution prior to that time. This court upheld a near comprehensive ban on firearms in Morton Grove under the Illinois Constitution, a ban that I think undoubtedly would run afoul of the Second Amendment under the U.S. Supreme Court's jurisprudence in Heller and McDonald. So as the state said in its briefing, the lower court held it unconstitutional under both the Illinois and federal Constitution, and we ask this court to overturn that holding in both regards, but we have focused our arguments on the Second Amendment because that is where the greatest protection for the individual right to firearm ownership lies at this time. Is there any difference in the analysis of a long gun versus a handgun? There's not, Your Honor, for a couple of reasons. First off, I'm looking at the longstanding tradition of licensing regimes. Washington State, for example, in 1911 required a license to possess a handgun, a rifle, a shotgun, or any other firearm. Indeed, when the U.S. Supreme Court identified keeping a gun in one's home for self-defense as the core right protected by the Second Amendment, it identified a handgun as the quintessential weapon used for that purpose. If anything, the application of the licensing scheme to long guns is less problematic in that regard. In Heller 3, the D.C. Circuit upheld the district's licensing scheme at the first stage of Second Amendment analysis, though that scheme applied equally to long guns and handguns. The defendant also advances an argument that application of the Void Card Act in one's home puts gun owners in, quote, an impossible situation. I don't think that her argument really amounts to arguing that it's impossible to comply with the Void Card Act. It's more an argument that the burden is undue or one that she doesn't want to comply with. Advancing these arguments, the defendant relies on a couple of hypotheticals, which are constitutionality of statute. That alone is fatal to these arguments. But even if the court considers these hypotheticals, they lack merit. The first hypothetical posits that someone could violate the Void Card Act by keeping a gun, for example, in her nightstand for self-defense and not carrying her Void Card around with her on her person at all times when she's at home. Say, keeping the Void Card also in the nightstand. Plain language of the Void Card Act belies that argument. The statute uses the word zess to describe both the firearm and the license. And so plain language suggests that if one is in constructive possession of a firearm in one's nightstand, then one would similarly be in constructive possession of the Void Card Act, similarly kept in an area where one could exercise control over it in one's own home. What about guests in someone's home, though? You know, if someone comes into the house, could they be charged with constructive possession as well? No, Your Honor. I mean, as long as they can't exercise exclusive control over the firearm. And it requires constructive possession of the firearm, too. Massachusetts courts, for example, have upheld a statute there that requires gun owners to secure their weapon whenever they are not in possession of it to ensure that no unlicensed person comes into possession of the firearm. And that advances the exact purpose of the firearm. So, for example, if a homeowner keeps their gun in a gun safe, which they know the combination and their guest owner, if they simply keep the gun in a place where their guests are unaware of its existence or can't exercise control over it, then the guests are not in constructive possession of the firearm. They don't need to have a FOIA card. So it's not required that every adult who enters a home where there's a gun have a FOIA card. And to the extent that the adult inhabitants of a home, for example, a spouse without a FOIA card, can exercise exclusive control over the firearm, then the interests of the FOIA card are in fact advanced by requiring them to go through the licensing process as well. Do we actually know in this case who purchased the rifle or who owns it? The record in this case does not answer that question. There's no suggestion that the defendant's spouse, for example, had a FOIA card or that the gun was in the possession of the defendant's spouse. The posture of this case is such that we don't have a lot of definitive factual answers about the circumstances. So we have to take this as sort of on the terms of the defendant's pleading that she was otherwise eligible to receive a FOIA card, didn't have one, had the gun at home, and those are the terms on which she was challenged. But we don't know if she purchased it or even owned it. Correct. But there's, again, she's not arguing that the FOIA card act sometimes was not applied to her because she wasn't actually in possession of the gun. The FOIA card act is unconstitutional as applied to an eligible citizen who keeps the gun at home. So again, your honors, whether it's because this court recognizes as it has many times in the past that the regulated conduct under the FOIA card act,  and the licensing requirement before eligible citizens possess a gun lies outside the scope of the second amendment, and therefore it's constitutional at the first step of its second amendment analysis, or because this court applies heightened means and scrutiny and recognizes the substantial relationship between the act and the important government interests in keeping guns out of the hands of inherently risky people, people ask that this court uphold the FOIA card act under the second amendment and reverse the opinion of the circuit court in this case. I have one question. Basically, this is about the defendant's argument or statement. On page 12 of its brief, it says, the state claims it needs to know who Brown is, but if her long gun never leaves her home and she's not disqualified from possessing the long gun, there is nothing for the state to determine. Is that argument addressed as applied challenge, that if she keeps the gun in the home, you don't need that? She doesn't need a FOIA card? That is the nature of the as applied challenge, your honor. I think there are two fundamental problems with that statement. First, the state doesn't know whether she is eligible until it applies the licensing scheme. That's the way the licensing scheme is used, and there is a longstanding history of licensing schemes being used in this way in the context of firearm possession to determine whether someone is in fact eligible. Second, both common sense and data belie the argument that there are no public safety concerns involved with a firearm that is kept in one's home through suicide, accident, domestic violence. Much of the gun violence in the state does occur in the home where the gun is kept, and so it doesn't mean that the state doesn't have an interest in ensuring that guns are kept out of the hands of inherently risky groups just because the gun remains in the home. Mr. Carter, any other questions? Seeing none, thank you, Mr. Bishop. Mr. Siegel? Would you address the question I just posed to Mr. Bishop? This comes from your brief. Yes, good morning. My name is Siegel for Vivian Brown. Thank you for hearing. I cut you off before you could start. No, that's certainly fine. That's certainly your prerogative. I just wanted to say my name, I guess. The quote from the brief on page 12, it goes to the broader point that the state doesn't actually have any evidence or data to support any of the assertions that it's making. This is what the state did in Eazell 1 and 2 in the Seventh Circuit. This is what the state tried to do in Moore v. Madigan in the Seventh Circuit. This is what the state tried to do in Kairos. They make these broad statements of, well, of course it's about public safety. They don't support it with anything. And then they just expect the court, almost on a rational basis, to say, oh, well, of course the law should be upheld. Of course it's for public safety. But Vivian Brown is a law-abiding citizen, except for the license that only ensures compliance with itself. She's not a disqualified person under federal law or state law from possessing a firearm. There is no allegation that she is mentally ill or a felon. Justice Burke, you're right. There's no allegation, really, that she was actually in possession of the firearm at the time. It was in her bedroom, and Ms. Brown admitted that in her motion to dismiss at the circuit court level. But she – Let me ask you this. You seem to be making – you are making arguments specifically about her. So are your arguments here as applied constitutional challenges or facial constitutional challenges? Because obviously they're very different analysis the court would have to perform. What is specifically on each one of these points? Is it as applied or facial? Justice Heiss, I think that it is a – it's an as-applied challenge to Vivian Brown, but it cannot be denied that in the wording of the circuit court's order that it would also apply to people similarly situated to her. So which is it? What is your argument? Is it as applied to her because of the specific facts in her case, or is it a facially unconstitutional statute? And is it a completely different analysis? No, I don't – I'm not arguing it's a facial challenge in the sense that the Floyd Licensing Act is invalid as to every circumstance. But I am arguing that it is at least a little broader as-applied challenge because there are people in Ms. Brown's shoes that the circuit court seemed to be addressing or recognizing in his orders. Can a court do that? Can a court, if there's an as-applied challenge, look beyond the facts presented in the specific case that is before it? I don't think the court has to look at it any more specific – I'm sorry, any less specific than Vivian Brown to rule in this case. I think maybe what the – when I say it's maybe a broader as-applied challenge is I am recognizing that, at least the circuit court recognized, that the order might affect people beyond Vivian Brown. But I am here today defending the case on behalf of Vivian Brown. And I am asking for the court to affirm the as-applied holding as the circuit court took pains on multiple occasions to say, I'm asking the court to affirm on that basis. And something I said a second ago kind of leads to a segue when I said I'm not opposing – Vivian Brown is not opposing the FOIA law on all bases. And the state has taken pains to talk about longstanding laws as if it's a one-size-fits-all. But the fact is it's not. The state – first of all, the FOIA law is from 1970, so to the extent anything is considered longstanding since 1970, I don't think that the case law says that. But all the statutes they cite, the Washington law from 1911 that they cite, never mind that that's 120 years after the framers in the Second Amendment, that was a law to apply to aliens. That's what that law was about. All the longstanding laws that the state – really the state's amicus, because the state didn't cite anything. But all the laws that the state, via their amicus, puts forth as longstanding regulations apply to, A, handguns, or, B, African Americans, Indians, and noncitizens. In other words, the purpose of these longstanding laws, so touted by the state in their amicus, were for the purpose of discrimination. Now, the Heller 2 Court made very clear that long gun restrictions are novel and not longstanding. The Heller 3 Court ruled against long guns because the appellant in the case, neglected to make any – the Heller 2 Court said, when we remand below, you can take discovery on the difference between handguns and long guns. And the plaintiff in that case chose, for whatever reason, not to do it. So when it came back up to the D.C. Circuit on Heller 3, they said, oh, well, there's no evidence saying long guns are different, so we'll uphold it. But that was because the argument wasn't made, which is similar to the U.S. v. Miller, where the long-ago Second Amendment case that was the only one pre-Heller that kept getting cited. But the fact is that nobody showed up to argue for the defense, and no one briefed anything on behalf of the defense. So there was really no defense in that case. On the issue of long guns, there was no case made in Heller 3. That's why. But in Heller 2, the court pointed out that it is not long-standing and they are, in fact, novel. So are you arguing that there is a difference in analysis, whether it's a handgun or a long gun? I am, Justice Garment, and I'm doing it for two reasons. One, because I'm not here on behalf of Vivian Brown to try and overturn cases like Taylor and Mosley. Second, you look at the historical text, you look at the historical record, and all the lawmakers and all the case law differentiates between handguns and long guns. You go back to colonial times, the colonists were required to have long guns. They didn't have to have a license to have one. The state of Virginia went so far as to buy one for citizens who didn't have one. You go back then to as we're supposed to be doing, and long guns not only were allowed, and you didn't have to get a license to have one, it was mandatory. And the reason for this, besides protection from bears and Indians and the British and marauders, was a recognition, as noted in Heller, that the Second Amendment elevates, above all other interests, the right of law-abiding responsible citizens to use arms in defense of hearth and home. In other cases, the Supreme Court specifically noted the sanctity of the home. Stanley v. Georgia, Lawrence, Griswold, many, many others, but the sanctity of the home is what this case is about. This is a narrow case. It doesn't involve handguns. It doesn't involve the sale or purchase of handguns, which you would still not be able to do. We're not challenging the requirement of having a FOIC card to purchase or sell. We're not challenging any issues with regard to the carrying of firearms in public, which, by the way, is a big difference between long guns and handguns. Handguns, you are allowed to carry concealed in public, of course, with a concealed carry license. Long guns, you are not. If you have a long gun in your home, it's not allowed to leave your home. You break it down and you can transport it somewhere legal, but in a workable state, it's not allowed to leave your home. And that goes to the broader issue, I think, of page 12 of my brief, which is if the long gun is by someone who is not federally prohibited from having one, and state law mirrors that, and it's just a long gun for protection, as is the most elevated right in the Second Amendment, then there is nothing for the state to determine. She is not a... Oh, of course. And back to the question about the analysis we have to use. Okay. This is an as-applied challenge, and you are arguing that the statute is overly burdensome to this defendant, specifically to this defendant, under these facts because it is an onerous burden on her right to have possession of this gun in her home, correct? Is that generally your argument? Yes, this gun being a long gun. How do we deal with the fact that, as applied, she never applied for a FOIA card? She never had to pay $10. She never had to go through what you suggest is a burdensome process on her right? Well, leaving aside, then, the issue that, for some people, they don't have $10 for a license. So this isn't as applied to her? Sure. And leaving aside the fact that if SB 1966 passes, that that fee might go up by a factor of four. It doesn't change the fact that a permissible license fee has to be used, as the state acknowledged, for the purpose of administering or defraying the cost of the license process. The state, in its reply brief, admits that it does not. The state admits that $6 of every $10 goes to the Wildlife and Fish Fund. The state admits that a $7 goes to the Police Services Fund and doesn't say what that's for. So that leaves $3 of the $10, 30%, that goes to the Police Firearm Services Bureau. And of that, the state lists, in its reply brief, the various uses that that $3 can go for. And at least half of it is for the Concealed Carry Act, which, by the way, already has a $150 fee for an applicant. And if you're one of the few non-residents that's able to apply, it's a $300 fee. So at best, 30% of the $10 fee goes towards this. And if you read the state's reply brief, it's clear that it's not even that. That, Your Honor, I suppose resembles a facial challenge because that fee applies to everybody. But, again, I'm acknowledging, as the circuit court did, that a ruling in this case affirming the circuit court affects other people. But I can only deal with the record on the court below. Is it your position, counsel, that the defendant in this case has a right to have a long gun in her home for self-protection without a FOIA charge? Is that where you're at on this? Is that the as-applied challenge, that as applied to someone in their home that wants to protect their home, they're not required to have a FOIA charge? It would be unconstitutional to require them to have a FOIA charge? Actually, Justice Thomas, the first sentence you said is exactly the position. Before you answer that, I think what's confusing here is, why are we talking about hypotheticals in an as-applied challenge that has nothing to do with your client? I'll give you one. Any Illinois resident with a firearm in the house who is not always carrying their wallet or purse or always wearing their FOIA card around their necks, which your client doesn't even have a FOIA card, how can that be an as-applied challenge? It's violating the act. Why are we dealing in hypotheticals that aren't the position that your client's in? I think that the court can affirm the circuit court and rule in Vivian Brown's favor without it. But the circuit court certainly felt that, perhaps, in arguing and finding that the state abused its police power under Article I, Section 22 of the Illinois Constitution. The truth is I'm not sure exactly what the circuit court reasoning for adding that in, but it certainly was important to the circuit court. Can I just tell you? Of course. Just a little insight on judicial decision-making. We're thinking about how to write an opinion in this case. If we say this is a facial challenge, the paragraphs are going to go in a certain way. If this is an as-applied challenge, there are going to be different kinds of paragraphs. We need to know what is this case, what is the issue in this case, so that we can determine how to make an analysis. And then you keep switching up and back and up and back, and that's not helpful to us. I apologize, Justice Tice. The order I would ask is that, as applied to Vivian Brown, a law-abiding person who is not disqualified from possessing a firearm, that it is unconstitutional to require her to possess a FOIA card, to possess a long gun in her home for self-defense, and that, as applied to her and those circumstances, that 430 ILCS 65-2 and 4 violate the Second Amendment and Article I, Section 22 of the Illinois Constitution. The fact is that in any criminal case, there is usually one criminal defendant, but a ruling in that defendant's favor could have far-reaching implications for other defendants in other cases. I think that's what the circuit court was getting at. It's what I'm getting at. But in terms of writing an opinion, affirming the circuit court, what I said there, those two sentences sum it up. Which is why, Justice Thomas, when you said, you asked me the question and the first part of it was, am I saying that it's unconstitutional as to Vivian Brown to have a long gun in her home for self-defense purposes without a FOIA card? I said yes. When, at the end, you asked, any person should be able to have a long gun in their home for self-defense, that might be the effect for some other person, but it's not what I'm asking in this case. I'm asking to affirm the decision in favor of Vivian Brown so that the charges against her can remain dismissed, that she should not be in criminal jeopardy for exercising a core Second Amendment right. Mr. Siegel, to be clear on the record, the order of unconstitutionality that's been appealed specifically refers to 430 ILCS 65-2A1 as applied to defendant, and you mentioned, I think, Section 4 as well. I thought I heard you mention Section 4, but it's limited, the written order, to 65-2. Well, Section 4, Justice Kovrig, yes. Subsection 4A20 is the photograph section. If it's unconstitutional to require her to have a FOIA card under 65-2A1, then subsumed in that would be the photograph requirement, and subsumed in that also would be 65-2A1. Mr. Siegel, you're essentially arguing that the state has no right to regulate the possession of a long gun in a home. Is that right? Well, I see my time is up, but I will answer if you may ask the court. Thank you, Justice Neville. That's not true. If a person is prohibited under Federal law. But she wasn't. No. Okay. And if a person is prohibited under State law, they're not prohibited if you're a felon. Can the State regulate her possession of a long gun in her home? Not as long as she stays a law-abiding person that does not have any sort of disqualifier. They are concerned about felons and the mentally ill. Federal law also prohibits illegal aliens, unlawful drug users, those who have renounced their citizenship. There's domestic violence misdemeanors. Any one of those, the State would be allowed to say, you can't have any kind of firearm in your home. But if you don't meet one of those definitions, or one of those characteristics or disqualifiers, and you want a long gun for protection in your home, which goes all the way back to colonial times, no, the State should not be allowed to regulate that if you are a law-abiding person. I do see my time is up. Thank you very much. Thank you, Mr. Siegel. Thank you, Your Honors. I'd like to start where Justices Tyson and Thomas were focused on asking what is the framework of the issue that's before this Court so that it can structure its response to that issue. The State understands, and I think this is consistent with  the unconstitutionalized applied challenge to the defendant in this case, but the only relevant facts about the defendant's case that would make it unconstitutionalized applied to her are that the gun was at home, that the gun was a long gun, and that she was eligible for a FOIA card had she bothered to apply for one. So that's how the State has understood and responded to this question, which is why, as the State said in their briefs, the Court should not engage with defendant's hypotheticals. We took the time to address those hypotheticals and show that we don't think that the arguments premised on them have merit, but it is fatal to those arguments in the context of this as-applied challenge that they're counterfactual to the defendant's case, as Justice Thomas suggested. Mr. Fisher, I didn't have the red light was on. I didn't want to ask another question. I'm not in favor of opposing counsel, but the last thing that he talked about was the fact that if his client was a felon, if his client had mental health issues and went through a litany of situations in which his client would not, under these circumstances, be able to keep a long gun in the home. If his client was a felon, if his client had mental health issues and applied for a FOIA card, would his client have received a FOIA card? No. Mental health issues might be somewhat broader than the actual restriction in the Act, but that's exactly the point of the licensing scheme. It is a prophylactic measure that the State uses to determine whether someone falls into one of these prohibited categories. That's why the Seventh Circuit held that if the State is allowed to impose these substantive restrictions, and again, Heller was explicit that the State is allowed to do so, that implementing a licensing regime to enforce those substantive restrictions must similarly survive Second Amendment scrutiny. And there is substantial peer-reviewed empirical data that supports the idea that these licensing schemes work to this end. This is a situation where there's some conflicting data. It's not a situation like Cherez, for example, where the data talked about possession in sensitive locations and focused on schools, and the court was then asked to look at a large bubble around parks and correctly said, okay, the data's not actually relevant at all. This is a situation where there is significant empirical peer-reviewed data that supports that these licensing schemes work, and in the face of conflicting data on both sides, that doesn't tie the legislature's hands in determining how it wants to go about pursuing its important interest in keeping guns out of the hands of these inherently risky groups. I want to talk briefly about what it means for a regulation to be long-standing in the Second Amendment context. Both the Fifth and Seventh Circuit have said fairly recently that that doesn't require an analog from the date of drafting of the Second Amendment or from the date of incorporation. And indeed, Heller specifically refers to restrictions on felons possessing weapons as an example of a long-standing regulation, but modern restrictions on felons possessing weapons are actually of 20th century vintage. So long-standing in this context does not require some sort of mirror analog from the 1790s for this court to hold that the regulation is long-standing. And indeed, the Washington state statute, for example, applied to long guns and rifles as well as handguns, imposed a $15 fee, which is actually higher than the fee 100 plus years later that Illinois imposes, and required everyone to get a license prior to possessing a firearm. Looking at the fee for a moment, the First Amendment features that the courts apply in the Second Amendment context does not require that the fee be used entirely to defray the cost of the licensing scheme. It has to be used to defray the cost of the licensing scheme or, and this is the U.S. Supreme Court's language, maintenance of public order in the matter of license. Here that's the safe possession of firearms in Illinois. The firearm training, the concealed carry licensing scheme, the Floyd card scheme, these are all parts of maintaining public order in this area. And it's clear that the fee that is collected goes to defraying specific state costs in this area, and they're not simply collecting a general tax on the exercise of one's Second Amendment rights. And unless the court has any other questions, people would ask that this court uphold the Floyd card licensing scheme under Second Amendment review and reverse the decision of the Supreme Court Board. Thank you, Your Honors. Thank you. Case number 124100, People v. Brown, taken under advisement, as agenda number 4. Mr. Fisher, Mr. Siegel, we thank you for your arguments this morning. You are excused.